674 A.2d 547

**Jeffrey W. LUBORE**

v.

**RPM ASSOCIATES, INC., et al.**

**No. 1226, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

April 4, 1996.

314

Joseph M. Mott and Daniel L. Owel (J. Stephen McAuliffe and Miles & Stockbridge, P.C., on the brief) Rockville, for Appellant.

James T. Heidelbach (Gebhardt & Smith, on the brief) Baltimore, for Appellees.

Argued before MOYLAN, DAVIS and MURPHY, JJ.

DAVIS, Judge.

This is an appeal from a June 15, 1995 order of the Circuit Court for Montgomery County granting a motion to dismiss. Three questions are presented on this appeal; we restate (and rearrange) them as follows:

I. Did the circuit court err in granting a motion to dismiss for failure to state a claim upon which relief can be granted with respect to appellant's claim for breach of contract?

II. Did the circuit court err in granting a motion to dismiss for failure to state a claim upon which relief can be granted with respect to appellant's claim for fraud and deceit?

III. Did the circuit court err in granting a motion to dismiss for failure to state a claim upon which relief can be granted with respect to appellant's claim for negligent misrepresentation?

We respond in the negative to the first question and in the affirmative to the second and third questions. We, therefore, affirm in part and reverse and remand in part the judgment of the circuit court.

## FACTS

On April 12, 1995, appellant Jeffrey M. Lubore filed a complaint in the Circuit Court for Montgomery County against appellees RPM Associates, Inc. (RPM), a Maryland corporation, and Robert P. Miller, Jr. (Miller), president of RPM. Appellant's complaint contained three counts: Count I for "Fraud and Deceit," Count II for "Negligent Misrepresentation," and Count III for "Breach of Contract." Given the procedural posture of this case, the following facts are taken directly from appellant's complaint.

On several occasions during the fall of 1993 and summer of 1994, appellant and Jeffrey A. Simpson, a manager and part owner of RPM, discussed RPM's growth and its future need to employ a marketing and sales executive. These discussions culminated with Simpson asking appellant whether he would

be interested in a position with RPM, directing business development operations, beginning on January 1, 1995. On September 14, 1994, appellant and appellee Miller met while attending a trade show in Atlanta, at which time they discussed the prospect of appellant working for RPM.

In early December 1994, appellant and Miller met for lunch and discussed an outline of an employment contract. During this luncheon, Miller told appellant that he knew appellant was currently employed in a lucrative position with another company, and that appellant would have to be offered a substantial equity position in RPM in order to leave his current employer. The two then proceeded to discuss the structure of a compensation and equity package, and the nature of appellant's duties. Ultimately, it was agreed that there would be a follow-up meeting between appellant, Miller, and Simpson.

That follow-up meeting was held in late December 1994, when appellant, Miller, and Simpson discussed salary, a benefits package, and an equity stake in RPM. The three men also discussed appellant's responsibilities should he accept the position. At the conclusion of their meeting, Miller agreed to confirm an offer of employment in writing.

On January 19, 1995, appellant met with Miller for a third time. They again discussed compensation and duties of the position. Two days later, on January 21, 1995, Miller faxed a written offer of employment to appellant, offering him the position of "Business Development Vice President," in accordance with the terms discussed at the late December and January 19 meetings. The offer reflected a base salary of $150,000 with a sales bonus of 4% of revenue, and equity terms, among other things, as follows: "2% vest after 15 months," and "3% option after 36 months." The offer also contained a "Projected Year 1" total salary of $310,000, and a "Projected Year 2" total salary of $470,000.

The next day, on January 22, 1995, appellant responded to the offer by fax. Appellant's fax response stated that the "offer looks great," but informed Miller that there were some further questions. Later that day, appellant and Miller spoke

on the telephone. During their conversation, after Miller clarified the terms and conditions of the offer, appellant "formally accepted" the offer. They agreed to a March 1, 1995 start date. Also during this conversation, Miller requested that appellant begin working on a business development plan to be completed on March 1, 1995.

Following the telephone conversation of January 22, 1995, appellant resigned from his current employer, effective January 31, 1995. Miller knew that appellant would resign effective January 31, 1995, because this was also discussed during their January 22, 1995 telephone conversation. Indeed, when appellant informed Miller that he would resign on January 31, 1995 because he wanted to take a month off before starting with RPM on March 1, 1995, Miller responded that taking a month off was a " 'great idea.' "

Between January 22, 1995 and February 15, 1995, appellant placed several telephone calls to Miller, requesting a letter "reaffirming the terms of the offer of employment by RPM and [appellant's] acceptance of that offer." On February 15, 1995, Miller sent a letter by fax to appellant "memorializing the terms of RPM's previous offer of employment ... as modified by [appellant] and Miller's January 22, 1995 oral agreement." The opening portion of this letter reads:

> As promised, here is a letter outlining the offer to you from RPM Associates, Inc. As you understand, the purpose of this letter is to reach agreement on terms under which you will come to work for RPM Associates. I am looking forward to you joining RPM Associates.

> Here is the outline of my offer:

Miller's letter concluded: "Finally, there is a contract that must be signed by each employee."

On March 1, 1995, appellant began working for RPM. At 5 p.m. on the next day, appellant received by fax a fifteen-page document entitled "Employment Agreement." According to appellant, the Employment Agreement, and many of its terms, were not previously disclosed to him. The Employment

Agreement contains, among other things, new terms and provisions that we restate as follows:

(1) A $1,000,000 liquidated damages provision;

(2) A provision allowing RPM to terminate appellant's employment at will;

(3) A provision allowing RPM to decrease the part of appellant's compensation based on revenue at RPM's sole discretion;

(4) A provision allowing RPM to assign the agreement and to convert it from an employment at will agreement to a two-year term agreement in the event of a company consolidation, merger, or tender offer; and

(5) An extensive non-competition and non-solicitation clause covering a large geographic area pertaining to existing, previous, and prospective clients, and precluding him from working for a period of time in the field of network integration services or any other business similar to that engaged in by RPM.

From March 1, 1995 to March 23, 1995, appellant "continued to work for RPM, and at the same time attempted to resolve the disagreement regarding RPM's attempt to modify the terms of the January 22, 1995 employment agreement." On March 23, 1995, however, Miller informed appellant that because appellant refused to sign the Employment Agreement " 'as is,' " the employment offer was " 'rescinded.' " Later that day, Miller sent appellant a letter by fax terminating appellant's employment.

After alleging the foregoing facts, appellant's complaint set forth a claim for fraud and deceit (Count I). This count, in pertinent part, reads:

During the course of negotiations, [appellant] and Miller agreed to the terms pursuant to which [appellant] would be willing to leave his lucrative position with CommVision and accept employment with RPM. Ultimately, these terms were memorialized in a letter which Miller transmitted on

behalf of RPM to [appellant] on February 15, 1995 (Exhibit "D").

19. Prior to [appellant's] acceptance of RPM's offer of employment, Miller and RPM failed to disclose to [appellant] that they intended to condition his employment with RPM upon his acceptance of a fifteen (15) page document entitled Employment Agreement which contained additional unconscionable terms ...

20. [Appellant] relied on the belief that Miller and RPM intended to honor the employment agreement of January 22, 1995 as memorialized in the February 15, 1995 letter (Exhibit "D"), and he was justified in his reliance.

21. As a result of Miller and RPM's fraud and deceit, [appellant] has suffered damages.

22. Miller and RPM's concealment of the additional unconscionable terms upon which they intended to condition [appellant's] continued employment with RPM was willful, intentional and malicious.

The complaint also alleges a claim for negligent misrepresentation (Count II), as follows:

24. Miller and RPM owed [appellant] a duty of care and made misrepresentations of material facts to [appellant], including but not limited to: (1) that RPM intended to employ [appellant] pursuant to the terms and conditions set forth in Miller's facsimile transmission of January 21, 1995 (Exhibit "A"), as orally modified and accepted by [appellant] on January 22, 1995, and reaffirmed by Miller in his February 15, 1995 correspondence.

25. Miller and RPM made the misrepresentations intending that [appellant] would act in reliance on them.

26. Miller and RPM knew, or should have known, that [appellant] was likely to rely on the misrepresentations, which if false would cause injury or loss to [appellant].

27. [Appellant] reasonably relied on the [appellees'] material misrepresentations. Had [appellant] known the truth concerning the misrepresentations, he would not have left his employment with CommVision.

28. As a direct, proximate, and foreseeable result of the [appellees'] material misrepresentations, [appellant] has suffered damages....

The complaint finally contained a count for breach of contract. In this count, appellant alleged that on "January 22, 1995, RPM entered into an employment agreement with [appellant]," and that on "March 23, 1995, RPM materially breached its employment agreement with [appellant] by terminating [appellant's] employment because he refused to sign the fifteen (15) page document entitled Employment Agreement ... which was received by him on March 2, 1995, after he had begun working for RPM." Appellant alleged that as a result of this breach he incurred a substantial monetary loss.

On May 24, 1995, in response to this complaint, appellees filed a motion to dismiss the complaint pursuant to MARYLAND RULE 2–322(b)(2) for failure to state a claim upon which relief can be based. On June 15, 1995, the circuit court conducted a hearing on the motion. At the conclusion of the hearing, the circuit court issued a ruling from the bench granting appellees' motion to dismiss. From this ruling, appellant appeals to this Court.

## DISCUSSION

### I

Before addressing the merits of this appeal, we shall first set forth our standard of review. Under MARYLAND RULE 2–322(b)(2) (1996), a defendant may seek a dismissal on the ground that the complaint fails "to state a claim upon which relief can be granted." When moving to dismiss, a defendant is asserting that, even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law. *Hrehorovich v. Harbor Hosp. Ctr.*, 93 Md.App. 772, 784, 614 A.2d 1021 (1992). Thus, in considering a motion to dismiss for failure to state a claim, the circuit court examines only the sufficiency of the pleading. *Id.* "The grant of a motion to dismiss is proper if the complaint does not disclose, on its face, a legally sufficient cause of action." *Id.* at 785, 614 A.2d 1021.

This Court, therefore, shall assume the truth of all well-pleaded relevant facts as alleged in appellant's complaint and all reasonable inferences drawn therefrom. *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624 (1995). Accordingly, because they were directly taken from appellant's complaint, we shall assume the truth of the facts set forth above.

## II

First, we shall determine whether the circuit court erred in dismissing appellant's breach of contract claim. As to this count, appellees argue that appellant failed to allege properly (1) the existence of a contract; and, in the alternative, (2) a breach of that contract.

With respect to the first argument, appellees contend that a contract was never formed because appellant refused to sign the Employment Agreement. Citing *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 665, 150 A.2d 884 (1959), and *Peoples Drug Stores, Inc. v. Fenton Realty Corp.,* 191 Md. 489, 494, 62 A.2d 273 (1948), appellees argue that, because the parties in the instant dispute intended to reduce their agreement to writing and intended that a manifestation of assent shall only be evidenced by their signature to the Employment Agreement, any prior oral understandings were not enforceable. *See Binder v. Benson,* 225 Md. 456, 462, 171 A.2d 248 (1961).

Appellant disagrees, however, that such was the intent of the parties. Rather, appellant asserts that the parties merely intended to memorialize a previously executed oral contract by a written document. *See Peoples Drug,* 191 Md. at 493, 62 A.2d 273. Thus, according to appellant, whether that intent was as appellees describe it or was as appellant describes it is a factual issue that cannot be resolved on a motion to dismiss for failure to state a claim.

We agree with appellant. Viewing all facts and reasonable inferences therefrom in appellant's favor, appellant's complaint sufficiently alleged the existence of appellees' offer of employment and appellant's acceptance of that offer. In

addition, the reasonable inferences drawn from the facts contained in the complaint support appellant's claim that any post-contractual writing merely was to serve as "evidence" or as a "memorialization" of a prior agreement. The complaint alleges that, on January 22, 1995, appellant "had a phone conversation with Miller during which the terms of the offer [as allegedly made in Miller's January 21, 1995 fax] were clarified by Miller and formally accepted by [appellant]." Also, according to the complaint, *following* the alleged offer and acceptance, and *following* appellant's resignation, Miller sent appellant a letter on February 15, 1995 referring to "a contract that must be signed by each employee." From the chronology of these allegations, it is reasonable to infer that appellant and appellees intended the offer and acceptance to be binding, and merely intended the "contract that must be signed by each employee," to be a document—under RPM's company policy—memorializing that agreement.

■ Although appellant alleged the existence of a contract, we hold that his claim must fail because he did not allege a breach of that contract. Appellees were legally entitled to terminate the contract at any time (and, therefore, did not breach it) because it was an at-will employment contract. In other words, because appellant was an at-will employee and not hired for a fixed period of time, RPM could terminate appellant at its pleasure. *See, e.g., Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981) (an at-will employment contract "can be legally terminated at the pleasure of either party at any time.").

Appellant, however, argues that appellees agreed to employ him for at least two years, and points to "a number of factors which [purportedly] support a finding that Appellant was not an at-will employee." We summarize these factors in list form as follows:

(1) Appellant was hired not as a low-level employee, but as a Vice President of Business Development;

(2) Appellant's compensation included equity in RPM;

(3) Appellant and Miller discussed the long-term growth of RPM;

(4) Miller requested appellant to draft a business development plan for the purpose of organizing and categorizing those areas which directly affect business expansion in the eastern U.S. during the next nine to fifteen months;

(5) Appellant's responsibilities were to include the allegedly long-term responsibilities of "New Account Development," "Personnel Recruitment," "Marketing Strategy," and "Partnership Strategy";

(6) Salaries and bonuses for appellant were projected for Year 1 and Year 2 of appellant's employment;

(7) "Appellant was to receive, in addition to a base salary, a sales bonus based on a percentage of revenue, obviously intended to be calculated at the end of the year.";

(8) Appellant's projected bonus compensation was a larger proportion of total compensation than was base salary, allegedly "meaning that the bulk of appellant's annual salary was conditioned upon being employed at the end of each of the two years.";

(9) A certain number of appellant's equity shares in RPM would vest after the first year, then a certain number more would vest after the second year;

(10) In his reply letter dated January 22, 1995, appellant stated, "I will be a major part of RPM's explosive growth over the next several years.";

(11) The business plan that appellant drafted contains a proposal to increase staff over the next nine months; and

(12) Appellant gave up a lucrative position with an established company to accept the position with RPM.

None of these factors—taken together or viewed individually—indicate that the duration of appellant's position was for a specific period of time or until certain conditions occur. Stated differently, from these factors it is legally impossible to

conclude that appellant was anything other than an at-will employee. We explain.

■ It is a longstanding principle in Maryland that an indefinite hiring is *prima facie* a hiring at-will. *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179, 292 A.2d 54 (1972) (citing *McCullough Iron Co. v. Carpenter*, 67 Md. 554, 557, 11 A. 176 (1887)). Where, therefore, the employment contract is of an indefinite duration, the contract is one for at-will employment, and, as we have already stated, either party at any time may legally terminate it. *Adler*, 291 Md. at 35, 432 A.2d 464. *See also Yost v. Early*, 87 Md.App. 364, 384, 589 A.2d 1291 (1991) (when the length of the employment contract is not specified, the employee is deemed to be an employee at-will).

■ Appellant's litany of factors is legally insufficient to create an inference that appellant's employment was anything other than at-will. Many of the above factors (6, 7, 8, and 9) concern the manner in which compensation was projected, paid, or calculated in the first two years of appellant's employment. These factors do not indicate that appellant was hired for a specific duration. *See Gill*, 266 Md. at 179, 292 A.2d 54 (" 'It is also well settled that a hiring at so much a week, month, or year, no time being specified, does not, of itself, make more than an indefinite hiring.' ") (quoting *McCullough Iron Co.*, 67 Md. at 557, 11 A. 176); *Board of Trustees v. Fineran*, 75 Md.App. 289, 302, 541 A.2d 170 (1988) ("Nor would the mere mention of a 12–month salary in Dr. Bellavance's 1984 letter or his 1985 salary memorandum suffice to create a 12–month term.").

■ Factors 3, 4, 5, and 11 deal with appellant's job responsibilities as they relate to the long-term growth and development of RPM. According to appellant, these factors indicate that the parties agreed to a long-term employment situation (to last for at least two years). Although the focus of appellant's job was long-range business development and marketing, the period of appellant's employment was not tied to the accomplishment of any particularly defined task, the duration of which is fixed or finite. This case, therefore, is not akin to

*Sperling v. Terry*, 214 Md. 367, 370, 135 A.2d 309 (1957), where the employee was hired to " 'supervise and work on the construction' of the house until completed." As the Court of Appeals noted, "This, ordinarily, would require between two and four months." *Id.* Therefore, the Court affirmed the trial court's determination that the contract was not at-will but, rather, bound the employer to retain the employee until the completion of the job. *Id.*

In the instant case, therefore, we cannot infer that, because appellant was responsible for RPM's long-term business growth, RPM was prohibited from terminating appellant at any time. Moreover, even if we were to conclude that the period of appellant's employment was for the "long term," such a period is far too indefinite and non-specific for this Court to conclude that the contract precluded appellees from terminating appellant until after the lapse of a fixed period of time. *See Mazaroff, Maryland Employment Law* § 3.2 at 166 (1990) (The presumption of at-will employment "can be overcome by express or implied terms which show that the parties clearly intended to create a binding relationship for a *specific* period of time or until *certain* conditions occur.") (emphasis added).

 Factors 1 and 10, as we understand them, are intended to show that the parties envisioned a long, prosperous, and happy association with each other.[1] From these factors, however, it is legally impossible to conclude that the parties agreed that appellant's employment with RPM would last for a specified time period. Commonly, an employer and employee jointly expect and desire that the employment will continue for years to come. This, however, does not change an at-will contract to a contract for a specified duration. *See Winand v. Case*, 154 F.Supp. 529, 545 (D.Md.1957) (even where a contract stated, " 'it is also our desire to have [the employee] remain

---

1. Presumably RPM would not have hired appellant for the high-level position of vice president if it did not desire appellant to be with the company on a long-term basis.

active in the business indefinitely,'" the employee was an at-will employee for an indefinite period). We are confident that, at the inception of most employment relationships, the employee and employer desire—from an optimistic standpoint—that the relationship will last for a long time. Even though they may share this desire, reasonable business people realize that the employee is not bound to remain on the job and may quit at any time without being liable for breach of contract damages, and that, by the same token, the employer may terminate the employee at any time without being similarly liable.

We further disagree that the second factor (appellant's compensation included equity in RPM) and the twelfth factor (appellant gave up a lucrative position with an established company) indicate a contract for a fixed term. In *Gill*, the employee's compensation was a base salary of $25,000 and "remuneration based on sales and upon bonuses and shares of stock. . . ." *Gill*, 266 Md. at 176, 292 A.2d 54. Specifically, the bonus provision provided for additional shares based upon earnings over three calendar years. *Id.* at 173–74, 292 A.2d 54. Nonetheless, the Court of Appeals determined that the employee "has failed to establish an employment contract other than a hiring at will." *Id.* at 179, 292 A.2d 54. The implication of *Gill* is clear: there is no legal basis for inferring from the fact that a component of an employee's compensation is equity based that the employment contract is for a fixed term. The remaining factor, number 12, is similarly insufficient. That appellant gave up a lucrative position with an established company sheds no light on the issue of the duration of his contract with RPM.

Based on the foregoing, therefore, we hold that appellant failed to allege any facts from which we could infer that appellant was anything other than an at-will employee. Accordingly, appellees legally could (and did) terminate appellant at their pleasure. As a result, appellees did not breach the alleged employment contract. Thus, we affirm the circuit

court's dismissal of the breach of contract count.[2]

### III

■ Our second task is to determine whether the circuit court erred in granting the motion to dismiss with respect to appellant's claim for fraud and deceit. Appellant makes clear that this count is not based on the pure falsity of appellees' affirmative representations, but rather is based on the misleading nature of those representations in light of the material facts that appellees failed to disclose. The tort of deceit—also called concealment or non-disclosure—consists of the following five elements:

(1) Defendant owed a duty to plaintiff to disclose a material fact;

(2) Defendant failed to disclose that fact;

(3) Defendant intended to defraud or deceive plaintiff;

(4) Justifiably relying on the concealment, plaintiff takes action; and

(5) Plaintiff suffers damages from defendant's concealment.

*See Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 231–32, 469 A.2d 867 (1984); *Schnader v. Brooks,* 150 Md. 52, 57–58, 132 A. 381 (1926) (fraud may consist of the suppression of truth as well as the assertion of a falsity, where one owes a duty to speak).

■ Appellees argue that appellant did not allege any facts establishing that RPM or Miller owed appellant a duty to disclose the contents of the Employment Agreement. *See Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 323, 389 A.2d 887 (1978) (non-disclosure is not actionable unless a duty to disclose exists). In this regard, appellees contend that there was not a fiduciary relationship or similar confidential relationship between the parties that would give

---

**2.** This holding renders moot appellees' argument that appellant may not sustain a breach of contract action against Miller, individually, as a result of the alleged breach of contract between appellant and RPM.

rise to a duty on the part of appellees to disclose. *See id.* at 323–24, 389 A.2d 887 (the duty to disclose may be triggered by a fiduciary relationship between the parties); *Finch,* 57 Md. App. at 234–36, 469 A.2d 867 (duty to disclose may arise out of a confidential relationship). We agree that the complaint does not allege facts sufficient to support an inference that a fiduciary or confidential relationship existed between the parties whereby appellees owed an affirmative duty to disclose.[3]

 Just because the relationship between the parties is not such that a duty to disclose is owed does not mean that appellant is legally foreclosed from maintaining a deceit action against appellees. One who conceals facts that materially qualify affirmative representations may be liable for fraud. *Finch,* 57 Md.App. at 239, 469 A.2d 867. Furthermore, concealment may amount to fraud

> where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.

*Schnader,* 150 Md. at 57–58, 132 A. 381. Thus, ordinarily when one owes no legal obligation to speak, mere silence is not actionable; but if what is stated amounts to a "partial and

---

3. Citing *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988) (discussed fully below), appellant argues that we may find that the duty to disclose arose out of the alleged existence of a "special relationship" and "intimate nexus" between the parties resulting from the pre-contractual negotiations among high level executives. As we shall explain, *Weisman* discussed a "special relationship" between high-level executives negotiating for employment as creating a duty of care for purposes of a cause of action for negligent misrepresentation—not a duty to disclose for purposes of fraud or deceit. Because we hold below that appellant's complaint sufficiently alleged a duty to disclose for fraud or deceit arising out of the allegations of appellees' partial or fragmentary disclosures, we need not decide whether a "special relationship" that can support a duty of care for the tort of negligent misrepresentation under *Weisman* can also legally trigger a duty to disclose for the intentional tort of fraud or deceit.

fragmentary" disclosure, that misleads because of its incompleteness, the "legal situation is entirely changed." *Brager v. Friedenwald*, 128 Md. 8, 31–32, 97 A. 515 (1916). *See also* Prosser & Keeton, LAW OF TORTS § 106, at 738 (1984) ("if the defendant does speak, he must disclose enough to prevent his words from being misleading...."); RESTATEMENT (SECOND) OF TORTS § 551, cmt. g ("A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not.... When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.").

Viewing all allegations and reasonable inferences in appellant's favor, as we must, we find that appellant has alleged sufficient facts to support the duty element of the tort of deceit. We may reasonably infer from appellant's allegations that appellees led appellant to believe that employment would be pursuant to those terms contained in the February 15, 1995 letter memorializing the parties' previous agreement, and that by not communicating the other terms contained in the Employment Agreement, appellees failed to tell the whole story. In other words, it is reasonable to infer from the allegations that appellees presented appellant with a partial or fragmentary representation, which was rendered misleading by virtue of the importance of the missing or omitted facts. Consequently, appellees owed a duty of disclosure.

In addition to the duty element, appellant clearly satisfied the other elements of the tort. The undisclosed non-competition provision and $1,000,000 liquidated damages clause, alone, present a factual question on the issue of materiality. Furthermore, appellant alleged that appellees failed to disclose these material facts with the intent to defraud or deceive appellant. Indeed, appellant specifically alleged that appellees "intentionally induced [appellant] to leave his lucrative position at CommVision before disclosing these additional unconscionable terms to him in order to insure that he was in a weakened

bargaining position." Additionally, the complaint sufficiently sets forth facts indicating that appellant justifiably relied on the concealment in resigning from his current employer. ("[Appellant] relied on the belief that Miller and RPM intended to honor the employment agreement of January 22, 1995 . . . and was justified in his reliance.").

With respect to the damages element of the tort, we reject appellees' assertion that appellant "cannot establish that he suffered any compensable damages as a proximate result of the alleged failure by RPM and Miller to advise [appellant] regarding the contents of the written [Employment Agreement] referred to in Miller's February 15, 1995 letter." In this regard, appellees argue that, as an at-will employee, appellant legally could not have had a reasonable expectation that he would be employed for any length of time, and that, therefore, he could not have suffered damages as a result of not remaining an employee of RPM. In support of this argument, appellees cite Stanley Mazaroff, *Maryland Employment Law* § 5.6(B), at 401 (1990), wherein the author states:

> Because at-will relationships can be terminated by an employer for any reason which does not violate public policy or some statutory prohibition, as a matter of law, applicants for at-will positions cannot claim that they were injured by reason of the employer's failure to satisfy an allegedly negligent representation.

Although here we are not dealing with the tort of negligent misrepresentation (discussed below), it would appear that the principle contained in Mazaroff's commentary would nonetheless be applicable to the tort of non-disclosure.

The problem with appellees' assertion (and with Mazaroff's) is as follows. In this count, appellant is not seeking recovery for wrongful conduct in derogation of a contract. As we explained above, appellant cannot maintain a suit for breach of contract because appellees did not commit a legal wrong by firing appellant. Instead, appellant desires recovery for appellees' allegedly wrongful act of making fraudulently incom-

plete representations to induce appellant to leave his lucrative position before disclosing these additional material terms in order to insure that he would be in a weakened bargaining position. Plainly, the wrong of breaching a contract is legally distinguishable from the wrong of intentionally making misleading partial disclosures for the purpose of deceiving a party into taking action.

Shifting the focus from appellees' allegedly wrongful conduct to appellant's damages clarifies our view. Under the fraud count, appellant's damages arise from relying on appellees' fraudulently incomplete representations—not from being terminated. In other words, had he known the true state of affairs, appellant would not have resigned from a lucrative position. Thus, even though appellant was not damaged as a result of being terminated (appellant being an at-will employee), he was allegedly damaged from being lured away from a lucrative position, in reliance upon appellees' fraudulently incomplete representations, into a vulnerable position with only two options: work under the allegedly oppressive "surprise" terms or quit.

To be sure, the dollar amount of appellant's damages may turn out to be precisely the same whether under a deceit count or under a breach of contract count. *See Ward Dev. Co. v. Ingrao*, 63 Md.App. 645, 659–60, 493 A.2d 421 (1985). The theory by which appellant was damaged, however, is very different. *See Giant Food, Inc. v. Ice King, Inc.*, 74 Md.App. 183, 190, 536 A.2d 1182 (1988) ("The presence *vel non* of an oral or written contract is immaterial to the case at bar, inasmuch as the action is not bottomed on a contractual theory," but a negligent misrepresentation theory.). Accordingly, because it alleges that appellant gave up a lucrative employment position based on appellees' deceit, the complaint contains allegations from which we can infer that appellant suffered damages, despite the fact that he was an at-will employee.

Although not binding on this Court, *Casale v. Dooner Labs., Inc.*, 503 F.2d 303 (4th Cir.1973) (applying Maryland law),

illustrates that an at-will employee may sustain a fraud action against his employer under facts very similar to those in the instant case. In *Casale,* a pharmaceutical salesman, who was terminated from his employment, filed suit against his employer for fraud, alleging "that he had quit his job with [his former employer] in reliance upon [his employer's] fraudulent misrepresentations concerning [his employer's] favorable situation in the industry and the salary and benefits of his new employment." *Id.* at 305. The evidence adduced at trial supported the employee's claim that he "was promised a larger salary than he received, other employment benefits that were not forthcoming, and that the nature, extent, and degree of establishment of the [employer's] business was falsely represented to lure him from his former employment." *Id.* at 306.

At trial, the jury returned a verdict in the employee's favor. *Id.* The issue before the United States Court of Appeals for the Fourth Circuit was whether the district court erred in submitting the issue of fraud to the jury. *Id.* After presenting the Maryland elements of fraud, the court held that there was sufficient evidence to support the jury's verdict. *Id.* Though not discussed, given Maryland's strong presumption that an employee is hired as an at-will employee, we may safely surmise that the salesman in *Casale* was an at-will employee. *Casale* is, therefore, helpful because it demonstrates that an at-will employee has successfully prosecuted a claim for fraud against his employer under circumstances similar to the case at bar.

Finally, appellees argue that the contention that they fraudulently concealed the fact that the appellant would be required to sign the Employment Agreement is expressly refuted by allegations in the complaint. In this regard, appellees state:

In Miller's February 15, 1995 letter to [appellant], which [appellant] contends memorializes the terms of his alleged contract with RPM, Miller informed [appellant] in no uncertain terms that "there is a contract that must be signed by each employee." Miller's letter clearly put [appellant] on

notice that he would be required to sign a written contract. Although [appellant] could easily have asked Miller about the contents of the contract, he did not do so. Having failed to inquire about the contents of the contract, [appellant] certainly cannot be heard to complain that Miller and RPM fraudulently concealed from him the contents of the contract.

We disagree. The glaring defect in this argument is that Miller's February 15, 1995 letter informing appellant that "there is a contract that must be signed by each employee" came *after* appellant's alleged acceptance of appellees' alleged offer and after appellant's resignation. This is consistent with appellant's allegation that appellees initially led appellant to believe that employment would be under a certain set of terms, and then, immediately after appellant accepted those terms and resigned from his former employer, revealed new material terms that appellant had to accept or else be terminated. From the allegations in the complaint, it is reasonable to conclude that appellant merely believed that the "contract" to which Miller was referring in his February 15, 1995 letter would do nothing more than memorialize the existing agreement between the parties.

Based on the foregoing, therefore, we hold that appellant's complaint sufficiently states a claim for the tort of deceit or non-disclosure. Accordingly, we reverse the circuit court's grant of a motion to dismiss with respect to this count of appellant's complaint.

**IV**

Lastly, we shall determine whether the circuit court erred in granting a motion to dismiss with respect to appellant's negligent misrepresentation count. *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 337, 439 A.2d 534 (1982), set forth the elements of the tort of negligent misrepresentation as follows:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Initially, appellees assert that they owed appellant no duty of care. We disagree. In an arm's length commercial transaction involving only economic loss, the duty of care for the tort of negligent misrepresentation may arise out of a "special relationship or intimate nexus." *Weisman,* 312 Md. at 448, 540 A.2d 783. In *Weisman,* the Court of Appeals specifically addressed whether such a "special relationship or intimate nexus" could arise in a situation involving two high-level executives engaged in pre-contractual employment negotiations. The Court prophetically opined:

We cannot conclude as a matter of law that the evidence before the jury was legally insufficient to permit it to find the existence of a duty of care upon Weisman at the time he made the representations to Connors concerning the proffered employment. We think the jury could have found from the evidence that the circumstances under which the two men came together in precontractual negotiations created a sufficiently close nexus or relationship as to impose a duty on Weisman not negligently to make statements of present or past facts about FWC or the new position of executive vice president. The manifest purpose of the meeting between the two high level executives was for Weisman to impart, and Connors to digest, relevant and accurate information concerning FWC and the proposed new position which Weisman intended to create.

*Id.* at 448–49, 540 A.2d 783. The Court added that the plaintiff had a great stake in receiving accurate information from the defendant, and that the defendant had to know that

negligently transmitting this information could result in significant economic harm to the plaintiff. *Id.* at 449, 540 A.2d 783. Thus, the Court held that the "requisite privity of contract or its equivalent essential to the establishment of a tort duty of care ... was an issue properly submitted to the jury on the evidence adduced at the trial." *Id.* at 451, 540 A.2d 783.

 Turning to the instant case, we are of the opinion that the complaint sufficiently alleges facts from which we may reasonably infer that a special relationship or intimate nexus existed between the parties such that appellees owed a duty of care not to make negligent misrepresentations. As in *Weisman*, we are dealing with employment negotiations between two high-level executives. Negotiations occurred over an extended period of time, allegedly beginning in the fall of 1993 and concluding in the winter of 1995. Compensation for the position included a substantial base salary, bonuses based on company revenues, and an increasing equity position in the company over time. Moreover, the stakes for appellant were high—he would have to resign from a very lucrative and stable position with his former employer.

Appellees attempt to distinguish *Weisman* from the instant case. They point out that in *Weisman* the employee had a fixed three-year contract, whereas here appellant was an at-will employee. In this regard, appellees argue: (1) that *Weisman's* holding that an intimate nexus existed was based, in part, on this fact, *id.* at 450, 540 A.2d 783; [4] and (2) citing Stanley Mazaroff, *Maryland Employment Law*,[5] that the

---

**4.** In *Weisman*, the Court stated, "Indeed, the existence of a special relationship between the parties negotiating the type of high-level, *long-term employment contract* involved here—particularly where the parties will be working closely in succeeding years—is more plausible than between parties selling and buying an automobile distributorship, who may never see each other again." *Weisman*, 312 Md. at 450, 540 A.2d 783 (emphasis added).

**5.** pre-employment discussions and negotiations between employers and applicants for at-will positions do not create the "intimate nexus" between the parties which is a condition precedent to the creation of the duty of care required by the tort of negligent misrepresentation. Stanley Mazaroff, *Maryland Employment Law* § 5.6(B), at 401 (1990).

Court's holding would have been different if the employee was merely an at-will employee. Although *Weisman* considered the fact that the contract was one for long-term employment, we do not read *Weisman* to eliminate, in all cases, the existence of an "intimate nexus" when the parties are high-level executives negotiating for at-will employment. *Weisman* simply does not address the issue. We disagree that the overriding (and distinguishing) factor in *Weisman* was that the contract was for a fixed term of years. Rather, our reading of the case leads us to conclude that the real focus in *Weisman* was on the importance of the accurate exchange of information in light of the relationship and the nature of the harm that could result from the defendant's negligence. *See id.* at 446, 449, 540 A.2d 783.

In the instant case, as in *Weisman*, appellees had to realize that negligently misrepresenting material facts would cause appellant to suffer a major economic loss—resigning from a secure and highly-paid position with his former employer. Under such circumstances, it is reasonable to conclude that after resigning there would be very little chance of appellant returning to his prior employer. Moreover, the parties dealt with each other over an extended period of time in order to consummate a close and potentially long lasting business relationship. As a result, therefore, appellant has successfully established, for purposes of surviving a motion to dismiss, a special relationship from which appellees owed appellant a duty of care.

Next, appellees argue that appellant failed to state a claim for negligent misrepresentation because the complaint does not allege that appellees made affirmative misrepresentations. In this regard, appellees state:

All that [appellant] alleged was that the written employment contract included additional terms that supposedly had not been discussed in his prior negotiations with Miller. However, the mere fact that the written employment contract

included additional terms that [the] parties had not previously discussed does not establish that the representations made in Miller's February 15, 1995 letter were false or misleading.

Thus, appellees contend that none of the terms of the February 15, 1995 letter were inconsistent with the Employment Agreement, because the letter dealt with compensation and benefits, while the Employment Agreement dealt with non-monetary issues such as non-competition and non-solicitation. Citing *Leonard v. Sav–A–Stop Servs., Inc.,* 289 Md. 204, 213, 424 A.2d 336 (1981), it is in this regard that appellees argue that a claim for negligent misrepresentation cannot be based on a failure to disclose, but only upon an affirmative misrepresentation.

We disagree that appellant is precluded on that ground from maintaining a negligent misrepresentation claim under the facts of this case. Appellant correctly observes that *Leonard* does not go as far as appellees contend. In *Leonard,* at the commencement of his employment, an employee filled out a questionnaire for his employer stating that he was covered by his own auto liability insurance. *Id.* at 207, 424 A.2d 336. Thereafter, without notifying his employer (no notice was required by the employer), the employee sold his car and cancelled his private insurance. *Id.* Subsequently, the employee, while driving a company automobile during the course of his employment, got into an accident that resulted in the death of his passenger—a fellow worker. *Id.* The co-worker's widow filed a wrongful death action against the employee, and the employee sought protection under the employer's automobile insurance policy. *Id.* at 207–08, 424 A.2d 336. The insurer denied coverage under the policy's definition of "insured," which excluded any person engaged in the business of his employer with respect to injuries to a fellow employee. *Id.* at 208, 424 A.2d 336. The employer, however, never informed the employee of this legal exclusion. *Id.* In a declaratory judgment action, the employee obtained indemnification from his employer based on, *inter alia,* a negligent misrepresentation theory. *Id.* at 206, 424 A.2d 336.

This Court reversed, and the Court of Appeals affirmed our reversal.

Regarding whether the employee could recover under a cause of action for negligent misrepresentation, the Court of Appeals stated:

> With respect to the negligent misrepresentation theory, [the employer] made no express representation by spoken or written words concerning its insurance. [The employee] claims negligent misrepresentation by silence. Only express representations have been involved in the Maryland appellate cases in which recovery on a theory of, or akin to, negligent misrepresentation was advanced. If any representation was implicit in [the employer] hiring [the employee] and furnishing him with a vehicle for use in his employment, the representation was that the vehicle was insured to the extent required by statute. Compliance with statutes is not questioned here so that a representation by conduct, if any, was true.
>
> We shall assume, however, without deciding, that if a party to a transaction is under a duty to speak, the failure to speak may, under appropriate circumstances in an action founded on *negligent* misrepresentation, constitute a representation.

*Id.* at 213, 424 A.2d 336 (footnotes omitted). Thus, *Leonard* does not—contrary to appellees' suggestion—automatically preclude a plaintiff from sustaining a cause of action for negligent misrepresentation where the defendant was under a duty to disclose material facts but negligently failed to do so.

Even if *Leonard* precluded a claim for "negligent misrepresentation by silence," however, *Leonard* would not necessarily preclude appellant from maintaining his claim under a negligent misrepresentation theory in light of the allegations of the complaint. As we mentioned above, appellant does not assert that appellees' affirmative representations were purely false as stated, but rather maintains that the representations became materially misleading by virtue of material facts that

appellees negligently failed to disclose.[6] Thus, the instant case is not on "all fours" with *Leonard*, because, in *Leonard*, the employer made no affirmative representations at all, but instead remained totally silent regarding the status of liability coverage. Here, in contrast, it is alleged that appellees represented only half of the relevant picture without disclosing the remaining material facts. As our discussion in Part III of this opinion indicates, a fragmentary representation can be rendered misleading by virtue of material facts not disclosed. As a consequence, it reasonably may be said that appellees negligently misrepresented the truth by affirmatively representing only a fragment of the entire picture.

We are not alone in this view. Oft-quoted respected authorities recognize that a party may be liable for failing to exercise reasonable care to ensure that a partial disclosure is not rendered misleading by virtue of undisclosed information known to be material. For example, according to RESTATEMENT (SECOND) OF TORTS § 551(2):

> One party to a business transaction is under a *duty to exercise reasonable care* to disclose to the other before the transaction is consummated, . . .
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading;

(Emphasis added).

The bottom line, therefore, is that *Leonard* does not substantially affect the viability of appellant's claim in this case for negligent misrepresentation for two reasons: (1) because *Leonard* dealt with "negligent misrepresentation by silence," whereas here we have (or, at least, are approaching) an

---

**6.** Appellees argue that appellant alleges for the first time on this appeal that Miller represented to appellant that employment would be on the agreed upon terms and that there were no other issues of consequence to resolve and no additional material terms of employment. We reject appellees' suggestion that appellant is making a new argument. Appellant's complaint contains facts from which it reasonably may be inferred that the terms of employment, as represented by Miller, encompassed all material terms.

ordinary negligent misrepresentation claim; and (2) because, in any event, *Leonard* expressly left undecided the viability of a "negligent misrepresentation by silence" claim.

Having distinguished *Leonard*, we are of the opinion that appellant's claim for negligent misrepresentation is viable under the circumstances of this case. As we just alluded, appellant's claim essentially, if not in all respects, is to be considered a traditional negligent misrepresentation claim because appellees were not silent, but rather affirmatively represented only part of the truth—a misrepresentation all the same in our opinion. The complaint's allegations support all of the elements of this tort.

We also reject appellees' assertion that none of the terms of the February 15, 1995 letter were inconsistent with the Employment Agreement, because the letter dealt with compensation and benefits, while the Employment Agreement dealt with non-monetary issues such as non-competition and non-solicitation. It is true that most, if not all, of the allegedly agreed upon terms dealt with compensation issues, while the additional new terms in the Employment Agreement to which appellant objects deal with non-monetary issues. This, however, does not mean that the Employment Agreement's "surprise" terms are consistent with the previously agreed upon terms of employment. Viewing matters most favorably to appellant, it is reasonable to infer that when an employee concludes an extended negotiation for employment, accepts the employer's offer for employment, quits his job, and then shows up for work, the employee would not expect that the employer would immediately thrust upon him new conditions never before discussed which are material.

Based on the foregoing, therefore, we hold that the circuit court erred in dismissing appellant's negligent misrepresentation claim.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

COSTS TO BE PAID ONE THIRD BY APPELLANT AND TWO THIRDS BY APPELLEES.